Good morning. May it please the court, my name is Jennifer Garcia. I'm with the Federal Defender's Office in Phoenix, and with me at council table is my colleague Dale Bache. I would like to start today by discussing a couple issues if the court is amenable. First, I am prepared to answer any questions about the two orders that we received regarding the oral argument, the case and then the Apprendi IAC issue, and I'd also like to discuss the sentencing ineffectiveness claim that is raised in the brief. Please proceed. No court has ever looked at all of the facts regarding the death sentence imposed in this case. Even the fact that the death sentence was sought initially was made without an individualized determination based only on the policy of the county attorney's office. Both prosecutors have said, in addition to the original defense attorney, that nobody viewed this as a death penalty case and no one acted accordingly. Counsel, with respect, as you and your office are well aware, we're reviewing this case under AEDPA. However much any of us may agree with your view about what policy was followed and whether they should have tried for death penalty, that's really not reviewable under AEDPA, is it? I think in this case, when you look at all of the circumstances, which is what is required by Strickland and Wiggins, the clearly established federal law on governing the ineffectiveness claim, I think it is because what Richter requires is that no fair-minded jurist could find what the state court's ruling anything other than objectively unreasonable. And in this case, the sentencing court was objectively unreasonable. But forgive me, maybe I misunderstood what you were saying before. I thought your point was that the decision that was made to treat this as a death penalty case as opposed to life without possibility of parole was basically an irrational decision. That's not the attorney's issue, is it? No, I'm sorry, Your Honor. That was part of the mitigation presented in this case. Okay. That's within the fold of the mitigation. Of the ineffectiveness claim. Yes, Judge, I'm sorry. But I think that, I mean, when you look at the cases that have applied Richter under these circumstances, this case is the clearest I have seen of objectively unreasonable analysis on an ineffectiveness claim. The court would not allow factual development. He used an improper test in order to even allow Mr. White to develop the facts in support of his claim. He made findings regarding deficient performance that were not supported by Mr. McVeigh's testimony. Mr. McVeigh did not testify that his failure to investigate or obtain records was the product of strategy. That's not in his testimony from the hearing. And yet the trial court, without any citation or evidence, found that he was not deficient because his decision to focus solely on the issue of the fact that the prosecutor did not believe this was a death penalty case was that that was a reasonable mitigation strategy. And that is completely opposite to all of the controlling clearly established federal law here. That's an interesting concept. I don't think I've ever heard that advocated before. I understand your other points about mitigation and probably agree with them. But the idea that the internal deliberations in the prosecutor's office about whether to treat this as a death penalty case as opposed to a life without possibility of parole, I've never heard of a case like that. Can you cite me any case where that has been found to have a mitigating effect? Your Honor, I think there are cases in Arizona that have found similar issues. I can't say that I've seen anything directly on point. What Arizona cases do you cite? In Arizona, there's a state court case called Gallegos, State v. Gallegos. And I'm sorry, I don't have the site with me. It's State Court v. Gallegos. And in that case, the Arizona Supreme Court found that the opinions of the investigating law enforcement officers that death was not the appropriate sentence for Mr. Gallegos was admissible as mitigation. And the Arizona Supreme Court in this case also found that the court should have considered the prosecutor's opinions regarding the death penalty as mitigation and that they weren't irrelevant. That was in the second direct appeal opinion in Mr. White's case. Speaking of the second opinion in Mr. White's case, the majority of the justices on the Arizona Supreme Court found that there was no error. Can you talk about that analysis and in particular the prejudice analysis? Yes, Your Honor. Because they've made that determination. Now we've got another layer of deference on top of it coming here to this court. Your Honor, in the second direct appeal opinion, the direct appeal is a record-based proceeding. So the only information that the Arizona Supreme Court had before it when it was reviewing the resentencing proceeding was what was in the record. So the few factors that Mr. McVeigh presented, including the opinion of the prosecutor, the fact that the victim in this case would not have died absent medical malpractice, and Mr. White's own testimony about his ability to be rehabilitated. So those were the only additional factors that were before the Arizona Supreme Court at the time of the second direct appeal. It wasn't until the second PCR proceeding where there was the hearing that Mr. White finally had somebody who investigated and tried to find out the mitigating evidence that's present in this case. Prior to that, no one had ever made any attempt to do so. So it was not until that proceeding that it was available, and so the Arizona Supreme Court in the second direct appeal could not have considered it. They did talk about the pecuniary gain aggravation factor being very compelling. Yes, they did, Your Honor, but I also would point to the fact that in the post-conviction proceeding after the first direct appeal opinion, Mr. Lockwood, in addition to admitting his ineffectiveness in other areas, specifically admitted his ineffectiveness regarding the aggravation phase, and when the judge granted the resentencing in that case, it included a retrial of the aggravating factor. The state, in fact, chose not to present any evidence in support of it, but there still were things that could have been argued and should have been argued to the trial court that no state court has ever looked at based on either the ineffectiveness of Mr. Lockwood or the ineffectiveness of Mr. McVeigh. At that time, the trial court did not have before it any kind of reasoned argument against the imposition of that aggravating factor. So you're saying that Mr. McVeigh fell below the objective standard of reasonableness, the main reason being because we look at his record, you know, he won the case, you know, basically, on the first PCR, right? Yes. And then, I mean, that was a lot. Absolutely. Although he had items to work with. Yes, a pretty solid case. Right. So he goes back and he presents the prosecutor's testimony, correct? Yes. And he presents evidence of, or tries to argue aberrant behavior, some other things. So we're looking at, aren't we, or you tell me, his deficiency being, as you allege, that he never looked at the mental health records that were, which you argue readily accessible to him. Is that correct? Yes, Your Honor. He conducted no investigations. So is that enough? Yes, I think so. And I think a great example is the case that the court ordered us to be ready to address, the Browning v. Baker case. Because that case is a very clear application of what we've argued in the brief, that it is absolutely clear that counsel cannot make a decision to focus on one mitigation strategy when they are unaware of the other things that are available. That you cannot end your investigation until you've actually conducted one. That you cannot make a reasonable decision to stop investigating without doing at least some investigating. And I think in this case, there are quite a few things that he could easily have done. For example, if he would have just asked for the Arizona Department of Correction records, he would have discovered not only the mental illness diagnoses, the schizophrenia, the huge variety of delusional letters, the letters he sent to Senator McCain, to Governor Napolitano at the time, the President. Those were all available just in the prison file. Would he have found a diagnosis for schizophrenia or paranoid schizophrenic at that time if he would have looked? Yes, there was a diagnosis of schizophrenia. I thought the diagnosis wasn't until 1999. Oh, maybe I'm mistaken. I thought it was 1989. I might be mistaken. But I know that there are, in fact, records. Indicia of mental health illness. And I'm just trying to figure out. No, I'm sorry, Your Honor. I think I misspoke. Okay, so if he had looked, he would have found this Indicia of mental health illness. And then what would he have done? He could have not only presented those records indicating the fact that one important part is that the Department of Correction staff became aware of these symptoms almost immediately after Mr. White was transported there following the death sentence. So that would certainly have been an indication that between that and the hyperthyroidism that Mr. White was also treated for at the jail in between the trial and the sentencing in this case, that those were factors that were affecting Mr. White at the time of the crime here. You think that they would have found that they were affecting him at the time of the crime, even though Judge Hancock said in his view, and, you know, we have to look at the record here, and he had this case from beginning to the end and was probably more familiar with it than anybody, short of maybe the prosecutors, but, I mean, probably arguably more. In his order, he said that Mr. White's conduct was calculated and rational. How would that have changed anything? Because, Your Honor, I think he could make those statements because of the fact that no attorney had ever conducted the mitigation investigation and presented it to him. In fact, when you look back at much of the conduct that was at issue in the trial, it can certainly be informed most significantly by both the mental health diagnoses and the hyperthyroidism because both of those issues caused paranoia, lack of impulse control, certainly things that would have contributed to the crime here. But in addition, different facts that the judge cited in support of his finding regarding that were simply, they weren't supported by the evidence. For example, one fact that the court pointed to several times was that Mr. White had indicated to one of his wives that he was going to use the money to go to medical school. Had anybody ever gotten his records and looked into that, I mean, Mr. White at the time of this crime was 36 years old, had not graduated from high school, in fact, had only not even finished the 10th grade, had failed numerous grades throughout. I mean, there's no possible way that he could have used that money to go to medical school. That's evidence of delusional thinking. I mean, the amount of work that it would take to get him to medical school from that point is almost unfathomable. Counsel, I want to follow up on Judge Murguia's question. It almost sounds to me like you're arguing not just about the penalty phase but the guilt phase. Are you arguing that we're supposed to undo the guilt phase in this case? Absolutely not. That would be regarding the aggravating factor in this case. Okay, so you are limiting yourself to the penalty phase. Yes, absolutely. Okay. So Judge Hancock, I'm sorry, then goes on to say, though, you know, I'm aware that now, I mean, in the end, he says I'm aware now that there were these suggestions that Mr. White had some sort of mental ailments. I'm paraphrasing. But even if it suggested schizophrenia, but that wouldn't have made a difference to me. And, Your Honor, I believe that those are unreasonable determinations of fact, based on the fact that he would not allow Mr. White to develop that mitigation and explain to the court and develop the record as to how those mitigating factors did affect Mr. White at the time of the crime and how it might have changed the outcome here. And, you know, Panetti is very clear as an example of a case that says a state court cannot restrict the fact-finding procedures in state court and then be unreviewable later. I mean, that was a case where the United States Supreme Court said that because they had not given him an adequate But the very last time that you were in state court on PCR proceedings, that was before the same judge? Yes. And so by that time, a mitigation expert had basically fully investigated and done for that second PCR proceeding what you were saying McVeigh should have done in the first proceeding, right? Some of it, Your Honor, only some of it. All right. So he had a pretty fulsome record now that's developed by the mitigation expert. Yes. And so the same judge who has carried the case along said that, okay, now I do know what you are saying should have been presented. I don't think it would overwhelm the pecuniary gain aggravating factor that I found in the first instance. In other words, even taking into account all of this mitigation evidence that's been developed, it wouldn't have resulted in a different sentence. And so what do we do with the factual findings made on the last round by that judge? Those factual findings are tainted by the fact that while there was a mitigation specialist appointed to this case, Mr. Roman certainly did a very voluminous amount of work here and presented a lot of exhibits. But if you look through his affidavit that's attached to the PCR petition, he was very clear that he's not a mental health expert. He's not a medical doctor. He could gather records. And what his job is is to then inform the attorney about what indications were developed from the records and then proceed further by gathering expert evidence. Here, because the court wouldn't allow any expert evidence to be developed, there was nobody who could put that information together or explain how this evidence affected Mr. White. And I think that's clearly illustrated when you look at the transcript of the testimony by Mr. Roman during the second evidentiary hearing because the judge was very clear throughout Mr. Roman's testimony that he could not opine either on diagnoses or on how whatever the mitigating factor might be had affected Mr. White. He repeatedly said that that was not Mr. Roman's, within his expert capacity. The state objected any time that he did try to draw a conclusion. So really, again, he said, I have evidence that likely he was hyperthyroid at the time of the crime, that I have found indications that he's mentally ill. I found indications of his substance abuse. But none of that, there was no evidence in the record because of the judge's refusal to allow the development. There was no evidence explaining, either confirming by an expert that that evidence existed or explaining how it affected Mr. White. And that is what is required by the Eighth Amendment. He has never had that. How do you cabin the, to be crass about this, the expense aspect of it? Is it your position that the judge in this case, having had a taste from the mitigation expert, that there was a possibility of mental illness, declined to go farther and fund a much broader investigation? Let's just say hypothetically that he was told it would cost a million dollars to do this. I'm just picking this out of the air. Would that matter? Is that something that the judge should take into consideration in something like this? I think practically, of course, it's something that a judge takes into consideration. In this case, I don't think that that could have been the basis. I mean, first of all, there's nothing in the record to indicate that. No, I'm trying to understand. I'm trying to cabin this in my mind. Based on what you're arguing, I'm understanding you to say basically that the judge had an absolute obligation to fund whatever additional research might be desired on your part about this man's mental health. These investigations can be extremely expensive. So I'm just asking, how do you cabin this? Well, first, I don't think it is by any means an absolute duty to fund any and every expert requested by the defense. That's not the standard, and it certainly shouldn't be. What is the standard? It would be anything that's reasonably supported by the evidence to develop something that's relevant. And relevance is the only test that you can use for mitigation evidence from the Supreme Court. So if they're alleging that they have indications of relevant mitigating evidence, they should have been allowed to develop that. And here, the judge authorized almost $80,000 for Mr. Rollman's services. So it's hard to think that cost could have been a consideration if he would have simply funded the various experts, even just a medical doctor and either a neuropsych or a psychiatrist to look into the brain damage and Mr. White's schizophrenia. Their services could have ended up costing the court much less than what Mr. Rollman did. And those requests were denied without explanation from the court? Yes, Your Honor, every one of them. Every one of them. And I did notice that he did grant a request for the co-defendant, Ms. Johnson. He did. Is there any – I can't remember. Is there a reason why – a difference in the record between the two why he granted that one and not this one? I don't think that it's clear. I think one thing that has been argued throughout the proceedings below was that Mr. White's mitigation was almost identical to that offered by Ms. Johnson. You know, the fact that she had children and she wanted to be around to raise her children and, you know, the various issues in her life were very similar to what had been offered in state court for Mr. White. So from my review of the record, there is not any kind of a rational basis for why she was allowed evidentiary development or given a life sentence versus Mr. White. So what's your best argument to show that Mr. White was prejudiced by Mr. McVeigh's deficient performance? Give me your best. I think the prejudice is extremely clear when you look at the huge amount and the compelling nature of the mitigation evidence that was available in this case. Mr. White, at this time, has been stipulated to be incompetent by both parties in the case. The district court judge below, the initial district court judge authorized funding for his own expert to come in and conduct an evaluation. And they all agreed that Mr. White is psychotic, that he suffers from paranoid schizophrenia, and respondents stipulated that he was incompetent prior to Gonzalez. This is not a minor mental health issue or some slight brain damage. This is a very serious mental illness that Mr. White has suffered from probably for most of his life. And if you look at the evidence developed in the second PCR by Mr. Roman, almost everyone who had contact with Mr. White prior to the crime talks about his delusions, his paranoia, and how it affected them in their lives and various things that they did. And so why would the medical... It is laid out pretty well, and so the judge did know about that. Why would the medical opinion or officiate blessing of it, I guess I should say, or, you know, saying, yes, that is true, what Mr. Roman was suggesting, why would that have made the critical difference here? Because, as I noted, Mr. Roman was not an expert. And the trial court itself limited his testimony to only the matters regarding, I think as the trial judge put it, he wanted to know what indications Mr. Roman had found that he would have recommended to the lawyer to investigate further. He completely shut down any kind of testimony from Mr. Roman about what the ultimate conclusions were or even what ultimate diagnoses he suspected from the records that he had obtained. And so based on that, I think he expressly stated that numerous times throughout the hearing, it's very hard to think that he considered anything else. Given the fact that on the second time around the judge did know about most of what you've accused counsel of having been deficient on, the only thing missing was further medical evidence. Given the fact that you got relief the first time, why isn't McVeigh's action the second time, when all the prison files and so on were available, the judge knew that, the only thing missing is the medical evidence. Why is that an unreasonable action or insufficient? I'm talking about the first problem of stroke, then. Why is it unreasonable on the second time around? Because Mr. McVeigh conducted no investigation. He was unaware of the mitigation that was present. The second time around? During the resentencing, yes. Mr. McVeigh, I'm sorry, I know the procedural history here is confusing. He handled the initial post-conviction proceeding, the resulting resentencing, and then the following direct appeal. So the second post-conviction proceeding, Mr. White had a variety of lawyers. I think Kerry Drobin was the lawyer who did the hearing. Okay, so let me be clear. Your IAC claim is about McVeigh, right? At the resentencing, yes. At the resentencing. Okay, and you had one time you appealed, we reversed, sent it back. And we're reviewing the second sentencing, right? The first… We didn't reverse. This is its first time in federal court. It was reversed by… Oh, I apologize. I'm sorry. I apologize. It is very confusing. So Judge Hancock, on his own, after hearing the evidence from Mr. Lockwood, just said, okay, don't need this to go any further. What can I do? Yes, and so then he had Mr. McVeigh proceed, is that correct? Yes, Your Honor. In representing him. Let me ask you, Judge Hancock's decision ultimately in his findings of fact and conclusions of law, the way he decides this, he uses the term that it wouldn't have made a difference to me. Okay. Does it matter? I mean, do we focus on that at all? I mean, can we just conclude that he's a reasonable jurist? Instead of… Because there's been some suggestion in the papers and some of these cases that I've read that it has to be… Because this is odd, because this was the judge. This was pre-ring, and this was the judge who made the sentencing determination. So we're not looking at one reasonable… Whether all this mitigation evidence that you're talking about would have convinced one juror, right? Had a reasonable probability of convincing one juror. Yes, Your Honor. We're looking at it from a judge, and I haven't had that opportunity. So is it a reasonable sentencer, the fact that Judge Hancock didn't say that? Can you tell me what's your best argument on how we look at that? At Strickland itself, it's very clear that the standard you use is that of an objective sentencer. So I'm not sure that it matters whether it would be a juror or a judge. I think the difference is that certainly as to the facts of the case, the trial judge would be in a better position looking at the facts because he had sat through the previous proceedings and the trials. But that doesn't mean he'd be in any better position to judge things that he had never been presented with based on the attorney's failures. So when he keeps saying this wouldn't have affected me, I would not have changed the outcome here, that is the incorrect standard. Strickland requires that it be an objective determination. What's your best case for that? Strickland, I think. You just think Strickland. Yes, Strickland is very clear, and I think really all the case law after that talks quite a bit about. But do we have a case where this judge was Mann versus Ryan? Yes. Does that shed light on this? I'm not sure that Mann addresses the issue of whether it's a difference between a judge and a jury, but I think that case, also the Browning versus Baker case that just came out, those all refer to the fact that it is an objective sentencer and that you can't look at the idiosyncrasies of a particular judge. And here, this is a judge that had continuously denied funding, denied the evidentiary development that was necessary, who then went ahead and just said, this would have made a difference to me without even knowing what would have been presented. And the way that he chose to discount everything was by saying, this didn't affect him at the time of the crime. He did these various things at the time of the crime, and none of these would have impacted him. Yet he had stopped anyone from explaining to him or presenting evidence how this would have affected Mr. White. Because he had never allowed that, he couldn't be an objective sentencer at that time. Can you, before you run out of time, address the Apprendi issue? Excuse me, the Apprendi issue? Address the Apprendi issue. Yes, I'd be happy to. The Apprendi issue is a fairly complicated issue, so I'm not sure if there's a specific part that you're interested in. Well, what do we do with it now? Is there an issue there that we need to be concerned with, and what would you suggest we do with it? Certainly, Your Honor, I would agree that Mr. McVeigh's actions in this case constituted deficient performance. In fact, the time he filed the opening brief, the Jones v. United States decision had already been, or it came out shortly thereafter, before there was oral argument or an opinion in the second direct appeal. This was an issue that has been being raised by Arizona defendants since the 80s. It's certainly within the prevailing professional norms to have raised it. Once Jones came out, again, it was the standard of care in Arizona for lawyers to be raising things based on those claims. Jones was the precursor to Apprendi and certainly had similar language that should have been included. McVeigh did raise a claim similar to this, but he raised it under the Eighth Amendment, although the court decided it on Sixth Amendment grounds, so it's a little strange. But he certainly could have referred back to the claim he raised. The rule that the court pointed to, 31.20, certainly would allow him to have done a variety of things. I mean, he could have tried to file a second motion for reconsideration. He could have asked for supplemental briefing. All of those things are possible. What do we do with it now? Your Honor, because it's not a claim in the habeas petition, I'm not sure that there is an available avenue, especially because I think it's difficult to show prejudice on that claim because at the time that these claims were being raised and the time that his second direct appeal was being litigated, the Arizona Supreme Court was denying all of those claims based on Walton because Walton was controlling authority from the United States Supreme Court that said that Arizona's system did not violate the Sixth Amendment. So, in fact, that's what Ring itself said, the Arizona Supreme Court's opinion in Ring, that was ultimately, cert was granted by the United States Supreme Court and Walton was overturned. So, because at the time it would not have been a successful claim on the direct appeal, it's difficult to show prejudice. Why would anybody want to be a capital lawyer? Everybody gets sued for IAC. I don't care how good they are. I mean, I understand why they might want to, but I mean, the reality is they'll get sued. It certainly is an issue in many cases, Your Honor. Do you want to save any of your time? Yes, unless the Court has more questions. I'm sure we do, but we'll wait. Okay, thank you. Let's hear from the State. Good morning. Good morning. May it please the Court, my name's John Todd. I represent the respondent in this matter. In answer to Judge McGeeh's question, I think Mann would have some relevance to your concern about Judge Hancock and the phraseology used to indicate there was no reasonable probability that this would change his decision. Tell me specifically why. I noted that Judge Thomas, our Chief now, specifically in his, I think it was concurrence or dissent, said that when a judge is reviewing this, go back and look at it in this unique circumstance that we have now, that we look at a reasonable sentencer, but you're also supposed to contemplate whether the Supreme Court of that Judge Hancock didn't do that here. So what's the effect of that if that's the standard we adopt? Are we talking about Judge Thomas' dissent from the en banc decision? Yes. He concurred in part and dissented in part, and I'm trying to remember exactly where he had this particular. And I don't, standing here today, remember exactly his reasoning, but the test on the Supreme Court is reasonable probability, and I believe the majority concluded that the wording that the trial judge in that case used. Sure. And so in this case, though, we have Judge Hancock who's making that decision, and he's making it for himself. And so my question was can we just, can he do that fairly without specifically acknowledging, because he kept saying it wouldn't have changed my decision, it wouldn't have changed my decision. Well, some of his decisions have been called into question. I really wanted to ask you, and I'd like to come back to this, but in 30 years, three decades, there was no mental health evaluation of this individual, and without any explanation by the judge. I'm just curious, what's your response to why that was reasonable? Well, Your Honor, the judge sat through the trial and he understood that this was a planned crime that occurred over a period of time. Mr. White first got the, put a down payment on the gun in November, then came back and paid the balance, all in preparation for the December killing. Now, Judge Hancock did appoint a medical expert at one point in the proceeding in 2005, and that was on the, what he considered a real issue is, does this defendant have some sort of mental retardation issue? Who was the mental expert in 2005? And I guess, was that soon enough? Because even in 1988, Mr. Lockwood, I guess his counsel, asked that White's competency be evaluated, his competency for trial. Right. And judge denied that in a one-sentence-minute order, and Mr. Lockwood, at that time, indicated that it was based on Mr. White's actions, that Mr. White spoke to numerous inmates about the case. He made repeated phone calls to state's witnesses, Susan's counsels and others, not to talk to them about the case, and wrote letters to the prosecutor discussing the case and other matters. The judge denied the incompetence, and then we have, in 1989, there was another request that the judge denied, and then later, I guess the whole time, Judge Hancock was aware of these letters he was receiving that appeared to show some sort of, you know, questionable behavior, and yet no explanation for no mental health evaluation, even though he was getting them for every attorney except, curiously, Mr. McVeigh. Well, I would direct your attention to ER 885 and 886, and this was the evaluation by the clinical psychiatrist. She was a professor in the Clinical Psychiatry and Neurology Department at the University of Arizona. And this was in 2008? No, this is 2005. 2005. So this is before the last hearing, before some of the requests for additional mental health, and she notes that he reported that his thyroid issue had been treated by therapy. But this person evaluated, correct me if I'm wrong, while he was at the ADOC, while Mr. White was in the ADOC. That's correct. It wasn't as a result of Judge White's approval, though. No, it was at Judge Hancock's order. It was Judge Hancock's order. He ordered it. Okay. Because he wanted to be sure that this defendant was not ineligible for the death penalty. But based on the conduct of the crime and everything that he had seen, he had watched the defendant testify at the first trial. He had, as Mr. McVeigh indicated, he didn't believe some of the statements that Mr. White was telling him. But doesn't your argument, this particular argument, in some ways really make the petitioner's point? Because the record shows that Judge Hancock was clearly very comfortable with his finding of pecuniary gain, and in White 2, three justices on the Arizona Supreme Court supported it. But in that instance where that's the only aggravating factor, doesn't it matter even more that the mitigation side of the evidence be properly presented so that he can have the full picture before him in order to weigh whether the mitigation evidence would have warranted a life sentence instead of the death penalty? And to Judge McVeigh's point, it just seemed by the time, from the get-go really, from when Mr. Lockwood had the case, but certainly by the time Mr. McVeigh picked it up, that there's so many indications of severe mental illness. And so when a trial judge who really is focusing very strongly on the sole aggravating factor doesn't have the full mitigation picture, how can that not be prejudicial? Well, Your Honor, Mr. McVeigh not only got him a new sentencing, but he had an investigator who did investigation. The record shows he can communicate with the investigator, or Hanratty. Well, true, although the investigator or Mr. McVeigh and the investigator together knew that there was a mental health issue because they tried to contact the mother to see if she would be able to fund further investigation. She wasn't in the financial position to do it, but then it seemed to drop off. There was no real mitigation evidence presented. It seems to me that Mr. McVeigh used his sound, reasonable judgment that having considered that, he disregarded and focused on what he felt was the most promising approach given the position of the former prosecutor. But you concede that Mr. McVeigh admitted to not requesting these medical and psychological records that were readily available to him. Well, if you look at the jail records, they're pretty insignificant. I'm just asking if you concede that Mr. McVeigh admitted to not getting those records. Sure, but there is no... And he also stated under oath, I believe, that he had no strategic reason for not getting them. That's correct. Okay. So why, then, are his admissions not enough to find him ineffective at that point? Well, because not having a strategic reason is not the same as not exercising your good professional judgment, your reasonable professional judgment, and deciding that that is not the best course to take in this situation given the facts of this case, given the facts of this defendant. Even when you're looking at death penalty, you're looking at weighing the aggravating factor, which here was the pecuniary interest, versus potential mitigating evidence. And here, you know, you say the ADOC records didn't reveal much at that time. It seems like there were over 500 pages of them indicating different things. I mean, we can go through every one of them, but some of them did, you know, indicate an indicia of significant mental—I mean, these delusions, these whole biometric things that were happening that he was sending the judge and all the other people, you know, messages of. I'm just—wouldn't that affect somebody's ability, I mean, judgment, in terms of whether that might be important at a mitigation hearing? It depends on the defendant. It depends on the crime. It depends on the other facts of the case. In 2005, Mr. White told the psychologist, neuropsychologist, that he had taken—that he had been diagnosed while in prison with schizophrenia. He had taken some medication for eight months, gave it up because he didn't feel it was helpful. He was not having any problems other than being anxiety. He didn't report any delusional behavior to this psychologist. This is in 2005. Now, the— Well, there was evidence of delusional behavior prior to that, and I understand that, you know, it looks like it ebbed and flowed in terms of, you know, his mental health from what we can piece together, and I guess that's the point that we're having to try to figure out, is whether a mental health evaluation—I assume there's ranges of degrees of schizophrenia. I don't know. I'm not a medical doctor. Right. And— And could it have been—is it possible that, you know, he's somewhere, you know, on that scale at different times? I mean, we just don't know. And would a reasonable person, a judge, jurist, would that have affected their determination in the end when ultimately you have to weigh the aggravating factors versus the mitigating factors? Okay, but we're looking at this in the context of an IAC claim, and part of that context is you have to look at the circumstances. You have to—the fact, as Judge Smith indicated, you know, it's simply because there's the potential of mitigation out there doesn't mean that there's an open checkbook to go get it. Absolutely. And that's one— I understand that. I'm just trying to take this, though, and have you respond to why it wouldn't in this case. I don't believe that Mr. McVeigh felt that there was a serious mental health issue worth pursuing beyond what he did. Counsel, can I ask you this, just following up on my colleague's question? We ask you to be prepared to discuss Browning versus Baker. Yes, Your Honor. What impact does that case have regarding the obligation of counsel to investigate all of the mitigating factors? One can argue one way or another about some things, but it seems pretty clear that at least under this case, there was an obligation to really push for that, to find everything that was out there. The Supreme Court talks about, you know, humanizing people. Didn't Mr. McVeigh fall short at least under the standard of Browning versus Baker? I don't believe so, Your Honor. The Supreme Court time and again has made clear that there's no checklist in IAC claim under Strickland, that the determinative factor is given the circumstances, the attorney is supposed to use his best professional judgment, and as long as that's reasonable. But as Judge McGee has been exploring with you, it seems like Mr. McVeigh did virtually nothing with respect to the mental health element, and that's obviously an extremely important component, as it turns out, in this case. Doesn't that have some consequence? I'm not understanding that it's extremely – that in 1988 or in 1999, it was an extremely significant component to the case. But, again, we're talking about sentencing here, and are you disputing the idea that if a person was – let's say, in quotes, normal, whatever that is in the mental context, at the time the crime was committed and you get down the road and you get to sentencing, and that the person is completely unable to help counsel at all, are you saying that the mental health element doesn't make any difference? No, I'm not saying that, Your Honor, but that's not this case, obviously. Right. I guess we're just trying to figure out, and you give us your best shot, and you tell us because this is the time. Give us the best shot. Why this isn't – why that isn't this case? I don't see in 1988 sentencing, the original sentencing, where there was a significant mental health issue that would have been persuasive in offsetting the crime that was committed for punitary gain. Let me ask you this because you keep focusing on the Strickland standard that we have to, you know, not engage in second-guessing, and, you know, the case law is very clear that we're to be cautious about that and that we have to respect counsel's best professional judgment, I think was the way you stated. Yes. But under the Supreme Court case law, can we say that counsel made a reasonable professional judgment if the record shows that he really didn't make a judgment at all? Because if I recall correctly, McVeigh said something along the lines of he just flat out didn't think of it when it comes to ordering the Department of Corrections records on mental health, and if he had known about all of these issues, he would have ordered the records, of course. So in an instance, it's different if the case, let's say, had overwhelming, aggravating circumstances and counsel talked to the family and, sure, there were psychological issues there, maybe even mental health issues, but counsel kind of evaluated all of the factors and said, I don't think that it would really help, so I'm going to go ahead and fight the aggravating factors instead. I mean, then we can say, well, you know, maybe we could have done it differently and present the mitigating evidence as well, but that was a reasonable choice. Here, it seems a little bit different because you've got the one aggravating factor, which he didn't even challenge at all despite having an opportunity to do so, and then you've got lots and lots of potential evidence of mental health, serious mental health issues, some of which he was on notice for and had been flagged for him, but he just flat out didn't think about doing it. How is that exercising professional judgment? Well, excuse me, Your Honor. As far as the not attacking the F5 factor, the punitive gain factor, that was evidence that was based primarily on the trial, and the Arizona Supreme Court had all the counter evidence when it decided the cases. So there was nothing unreasonable about that judgment in terms of what you have to look at is if you find that to be deficient performance, is what those records would have shown at that time. Counsel, with respect, the ABA guidelines, which were in effect certainly by the time of the second resentencing, indicated that counsel had to make, and I'm quoting now, efforts to discover all reasonably available mitigating evidence, including medical and mental health evidence. That was the 1989 ABA guidelines. And given our Robinson v. Schroeder case plus the ABA guidelines, when the Arizona Supreme Court indicated he had no duty to check for the medical records, wasn't that just wrong, fairly wrong? I don't recall the exact wording of the Arizona Supreme Court on that. But they said he had no duty to get these records, right? Well, it is clear that Strickland analysis and the ABA guidelines are not the same. Well, but the ABA, I mean, I think the Supreme Court and certainly our court has made it clear that these are some of the criteria that are taken into consideration when you're looking at the first prong of Strickland. Was the action taken reasonable and professionally responsible? Absolutely. Do you agree with that? I absolutely agree with that. Okay, so those guidelines, are you disputing the fact that those guidelines said he had to look into medical and mental health records? In every case, regardless of what the facts and certs were saying. It says to make all efforts to discover reasonably available mitigating evidence of that nature. Because an attorney in a trial case has limitations in terms of resources, has limitations in terms of time, it has limitations imposed by the court, it has limitations imposed by other counsel. But my colleague asked you about, for example, the prison files themselves. I don't know what you said, 700, 800 pages, 500 pages of material. That was readily available. That could have been available with a letter, basically, and he didn't do that. Indeed, he didn't think of it. I'm not sure that at that time there were that many prison records that would be relevant to this case. Say there are 200. Whatever was in there, he didn't think to ask for it. That's true. That is true. And so if you find that to be unreasonable for him not to have done that, given his time constraints. How long would it take him to ask for that? It wouldn't take him long. Okay, I wouldn't think so. But what do those records show that that would be? Forgive me, counsel, and I mean this with respect. You don't know what it's going to show until you look at them. And what we're talking about here is whether he took the action to see what was there. And as I understand the ABA guidelines and Robinson v. Schroeder, the question is did he have an obligation to inquire. And I think that answer is pretty clear. Yes, he did have that. And my answer was going to the prejudice part. Well, that's a separate. I'm getting to the first part right now. Do you agree that under the first prong of Strickland that Mr. McVeigh didn't fulfill his obligation when he failed to get this medical and mental health information? I'm. You're talking first prong right now. Right. I understand. Let me couch it in terms of Rompelia. You seem reluctant to give an answer. Well, I don't mean to be reluctant to give an answer, Your Honor. I would say. Your reluctance speaks volumes. Okay. You could find that to be deficient performance. But you'd have to, if you can look at all the circumstances, Rompelia is an excellent case to pointing this out, particularly Judge O'Connor's concurrence. And she was the deciding vote in that case. And she indicated that what was reasonable in that case was for the attorneys simply to look at the file that was in the courthouse nearby. They had time in which to do it. So my only point is that in judging the deficient performance prong, you do have to consider the circumstances surrounding it. Agreed. But on the first prong, it is clear. I think it's pretty clear you're agreeing implicitly or openly. Then on the first prong, the law was pretty clear you needed to do that. So let's now talk about the second prong. I'm saying in this particular case you're saying that he should have done it. Correct. That's right. I'm saying in this case, Mr. McVeigh, under the ABA rules, our case law, he needed to do this. He didn't do it. He said he didn't really think of it. There was no strategy, as my colleague mentioned. So let's assume for purposes of discussion that the first prong of Strickland is satisfied. The reason for the mitigating evidence is to determine whether this person is going to die or have a life without parole. And the Supreme Court has made it very clear that one of the reasons that we look at mitigating evidence is to basically humanize people that otherwise, because of the nature of their crimes, can appear so heinous that people just get angry and they try to take vengeance. They want us to look at people in a very human way. This mental health element plays a very important role in that determination, does it not? It can in some cases. Okay. And if the evidence that has been deduced in this case were presented to a pre-sentence or a determiner, can you see why that might play some role in determining whether death was appropriate? Given what was in the pre-sentence report, the facts of the crime, his conspiracy, it seems to me that a fair-minded sentencer would weigh it very little. That's kind of interesting to me. I have difficulty following how that would be. This wasn't considered at all before. There has to be two sides of it, and you're saying that the pecuniary motive was the only one. I know the other side has attacked that as well. But the reality is if you add this in, and everybody seems to concede he couldn't help the counsel anymore, that was determined fairly early on, how could that not play some role in determining whether this individual was warranting any kind of mercy at all? I'm sorry. I don't recall where in the record it says he was unable to help either Mr. Lockwood or Mr. McVeigh. I usually rely on the counsel to cite the record, but it's in there. Okay. Or at least it might have undercut the notion that the sentencing judge had that the pecuniary gain factor weighed large. Even the prosecutor handling the case thought that Mr. White was very manipulable and that Susan was the instigator, the mastermind, had really pushed him repeatedly to do this. Do you think that some evidence regarding his mental illnesses could help bolster the prosecutor's suggestion that Susan was actually the one pushing him to this? I don't believe the mental health evidence in the record at that time would have been significant. I think probably the strongest evidence for the aggravating factor of pecuniary gain was Mr. White's own admission that he was going to get money to go to medical school. When he hadn't graduated from high school, he'd attended like 20 different schools. And the reasonableness of such a statement is so questionable. You think that's not possible, that a mental health evidence would have shed more light on that and maybe undercut the strength of the pecuniary gain? There's no question, apparently, that there was discussion about pecuniary gain and that that was what the whole life insurance, but you don't think it would have shed some light on it? Of course, that piece of information was before the court and the Arizona Supreme Court. But what wasn't before the Arizona Supreme Court and the court was any evidence from a doctor of his mental health? That is correct. Okay. I just wanted to ask you before your time ran out, I asked this of the federal public defender, do you know why the Rule 11 request to evaluate Ms. White was not immediately granted and approved and the request for Mr. White was not, or any of, you know, why she was given such immediate approval? No, I do not, Your Honor. Any other questions from my colleagues? Thank you very much. Counsel, you have a little rebuttal time. Thank you, Your Honor. I just have a couple of very quick points. Regarding the evaluation in 2005, that was for the limited purpose of doing IQ testing on Mr. White because during the investigation of the second PCR proceeding, counsel and the mitigation specialist found evidence of IQ scores from Mr. White when he was a child as low as 74. And based on that, after Atkins versus Virginia was decided by the Supreme Court, that would have made him ineligible for the death penalty. So even though Mr. Goldberg had been repeatedly asking for appointment of an expert to conduct additional testing for this specific issue, the Attorney General's Office stipulated to the fact that someone should be appointed for the limited issue of the IQ testing. And Mr. Goldberg moved several times saying that the fact that this doctor is already going to be there, can she just do the other testing? And Judge Hancock denied it. So it was just on the limited question of his current IQ. Was that because of the Supreme Court's case or just generally? Because of the Supreme Court's case. And second, regarding Mr. White's statements that he made to Dr. Herring about the fact that he didn't have any mental health issues other than anxiety, if you look at the expert reports that were filed in the district court, it's very clear that Mr. White does not believe he's delusional. Mr. White firmly believes that the torture that is real, that he is experiencing, and does not believe that he is schizophrenic or mentally ill in any way. So relying on his own statements that he's not mentally ill certainly are very different from the fact that he believes he's been being tortured by DOC for 30 years. Okay. Regrettably, your time is up. We thank both counsel for their argument. These cases, of course, are always challenging. But we appreciate the professional manner in which you have helped the court deal with these issues. The court stands in recess for the day. This case is submitted.
judges: M. Smith, Murguia, Nguyen